Today, last case of the day, 3-13-08-36, W.C. Peoria School District 150 v. Workers' Compensation Commission, San Francisco, Sonoma. Justices, good afternoon. Steve Kelly, counsel. May it please the Court. I think I've been in this business for too long because I'm the attorney that tried the picnic case and lost it. I'm in a little circle. I represent a bunch of men in that case. It started to bring a familiarity back there. I'm here today on this case, and this is a case that represents the school district. This is a manifest weight issue. What I have done with some of my clients in the past 5-10 years is I've tried to avoid coming up here on manifest weight issues. I got the sense from the Court 5-7 years ago that you're being flooded with manifest weight issues and we're not having a good time with as much cases as we're coming here. You're always welcome. Thank you. This is one, however, I do believe that is against the manifest weight of the evidence. The reason I say that is this. This involves two work accidents filed by Mr. Serrano against my client. In essence, the second accident, April 26, 2011, in my opinion, is not relevant. By the time the second accident occurred, he had already been a right shoulder replacement candidate. The first accident, January 22, 2010, is what is at issue here for us, determining what effect, if any, that accident had on his need to have the right shoulder replacement. This case was tried and it ran through the levels, and in October 2013, the Circuit Court affirmed the Commission's decision. It is clear in this case that on January 22, 2010, Mr. Serrano was breaking up a fight for my client, the school district. He's working there as a police officer. And at that time, it is clear the record establishes that as of January 22, 2010, he had a pre-existing condition in the right shoulder. Let's assume that he did. Was he symptomatic at that point? That's a good question because that... But he testified he wasn't. Well, he testified on cross-examination that he would have discomfort and problems with weightlifting activities. And the reason that's a great question is this. In the approach of the case and the approach of the depositions before he testified, the allegation from the other side was he was asymptomatic. He didn't have any pain. Well, cross-examination bore out at the time of trial that that was not necessarily true. He indicated that with certain activities prior to our work accident, he had complaints with that activity. Now, you either have complaints or you don't have complaints. Well, it's just the steward opined much earlier in the morning. I mean, I suppose somebody who, you know, you might go out and lift weights for the first time in a year or two. You don't think you'd have a minor twinge of pain. Does that mean you've got a bad shoulder? No. Well, in the contents of this case, if you do an MRI of my shoulder after I have that problem and shown I have the type of degenerative condition he has at that time, and I'm having complaints to that shoulder predating a work injury, I was symptomatic. But then what about the argument, and this was the basis, that employers always take the employees as they find them? And it doesn't have to be the sole cause. If it aggravated or exacerbated a preexisting condition was a causative factor, even if not the main or the primary, recovery still lies, does it not? It does under the circumstances of that premise. However, when you have someone who's 100% bone on bone, when you have someone who the doctor's opined, and you look at the doctors, there's two IME doctors in this case, one being Dr. Newcomer, who was hired by counsel, and one being Dr. Rotman. With conflicting medical opinions. Conflicting medical opinions. However, what's really important, I think, the commission leaned over in this case, was there is a treating physician, Dr. Hodder, and Mr. Serrano testified that he was his treating physician. He went there on behalf of the employer first, but began treatment, and saw him just not one time, on several occasions, made his own appointments, got diagnostic studies done through Dr. Hodder. Dr. Hodder's record, which was part of, offered by the other side, indicates, in Dr. Hodder's opinion, that the effects of the work accident, January 22nd, 2010, resolved, and that his condition was degenerative. It's in the record, and it's unrebutted. So now it's two to one. Well, it's two to one in the sense of this. You have a doctor now, unrebutted, saying that the effects of the work accident resolved. Unrebutted. Treating physician. Then you have two independent medical examiners in this case. If you look at the testimony throughout the direct and cross of Dr. Newcomer, and the direct and cross of Dr. Rotman, potentially, as we had in the Hagman versus Methodist case, I think the Commission can weigh those out equally, and almost wash those opinions out in this sense. Dr. Newcomer admits that this gentleman had a condition that may have needed this surgery absent the work accident. Dr. Newcomer admits that this gentleman, in his mind, should have been symptomatic predating this work injury. And, in fact, the testimony bore that out. He was somewhat symptomatic, i.e. with certain activities, but he was symptomatic. To me, that's a big difference. And maybe I'm reading too much into it, but you either have problems with your shoulder, or you don't have problems with your shoulder. Didn't he testify that the accident of January 22nd aggravated the preexisting condition beyond normal progression? Dr. Newcomer did testify that on direct examination. The same token on cross-examination, he said that he couldn't tell how far along this condition was at, or how long it was degenerative as of January 22nd, 2010. Does he really need to? You take him as you find him. Let's assume it was degenerative. If it moved it along beyond the normal progression and exacerbated or aggravated the condition, that's still recoverable. He doesn't have to pin down the extent of the degenerative process, does he? Well, the condition in this case is the degenerative condition in the shoulder, and I don't think any of the doctors, and they all agree, can't tell you how physically it was aggravated. What he says is the claimant was asymptomatic prior to the fall and became symptomatic after the fall and has remained symptomatic. That's where I have my issue with the case, and you may disagree with me, but I don't think the evidence bears out that he was asymptomatic prior to the fall. I think that he says with certain activities he had problems with the shoulder, and that's what arthritis does. You have problems with certain activities. You do things and you have problems. It doesn't mean every day. Okay. What things did he say? Well, he said on cross-examination, I asked him the question, with certain weightlifting activities, did your shoulder bother you? Yes, they did. Was that the only example that he gave? That was the only example on cross-examination he did give. And it is true what Justice Hudson said earlier, and I have a set of weights, and on the rare occasion that I use them, it usually bothers me if I get sore. If a doctor is telling you, as your physician, that you're going to need a shoulder replacement, no matter if you had an injury or you didn't have an injury, I think that plays a role into it. How far along are you? Before he became symptomatic, who told him that? Before he was symptomatic? Yes. No one told him that, but in those situations, there's usually not a doctor. I'll rephrase that. You have two doctors indicating he would have needed the surgery absent the work accident. At some point. At some point. But if it accelerates it, it's compensable, isn't it? If it accelerated, and you believe the evidence shows it accelerated, then I think it is compensable. I don't think the evidence establishes it accelerated. Did he ever testify that shortly after the event he began experiencing shoulder pain, it eventually got worse over the course of the day, and that he reported severe pain in his right shoulder  That was immediately after the event. And as the records show, he gets better after that. Now, he testified he never got asymptomatic after the accident. However, it is my position that he continued to work full duty. Structurally, there was nothing changed in the shoulder. The doctors agreed structurally there was nothing changed in the shoulder, and the doctors indicate that this surgery is something to address the structural issue in the shoulders, 100% bone-on-bone. And so this gentleman needs this type of surgery for that condition that existed prior to the accident. It comes down, it relies heavily upon if he is asymptomatic prior to the injury, and he has an injury and he's symptomatic all the way through. So it boils down to whether the commission found his testimony believable and credible, and whether the commission agreed with the opinions of the IME, and they did. When you weigh his testimony with what's medically in the evidence, meaning I think every doctor concluded that they anticipated and expected him to be symptomatic pre-dating injury. They say that during their testimony. We think that he was symptomatic, even though he went in and told them, this isn't trial. Before trial, he goes into the doctors and says, I was asymptomatic. They all agree that they think medically what they saw in the X-ray, and that's why there's a lot of testimony of Dr. Rotman about the MRI and how the bone was flattened. It's a ball and socket. His was flattened and it was that degenerative. Let me ask you, how long was he on the job before this injury occurred? I don't believe it was longer than five to six years. Okay. He's on the job for five to six years. There's no dispute that he was intervening in an altercation or a fight, right? There's no dispute to that, yes. He's on the job for five to six years. Did he ever miss work? Did he ever miss work? Was he ever making any complaints about his physical condition before then? Not to my client. Then he has a witness incident. He becomes symptomatic of the pain. He continues to have the pain. And we're saying, well, he must have had some symptomatology, and yet there's no evidence to support that argument. The evidence is the opposite. Except the opinion of Rotman. And Dr. Hodder, who indicated that the effects of this accident resolved. So from an employer standpoint, and you're evaluating this case back closer to the accident, one of the treating physicians indicated that his condition resolved. Then you have Dr. Johnson, who is an orthopedic doctor, who didn't opine to anything. They didn't take his testimony. So what we have is two IME doctors who appear to have different opinions, and you have a treating physician who indicates that he does not believe that it's related, and it resolved. And you have the testimony of the claimant, and you've got the other doctor, a newcomer. Testimony of the claimant. And newcomer. And newcomer. And if the claimant's representations to Rotman is true, that he was aces of McIntyre, I don't think the evidence bears that out. There's also an issue as to the records back in, way back when, the motorcycle accident. We're not sure whether or not he injured his right shoulder in that motorcycle accident. I mean, there's some difference in the notes. The nurse's intake notes say right shoulder. But even if he had, again, you come down to the application of the not sole cause required. It's, as far as relevance in that past accident, it's way back. I don't think that was the cause and need of this shoulder replacement. It's our position that this is a gentleman, the diagnostic studies bear it out, the orthopedic surgeons bear it out, that he needed the surgery, absent his trauma. Regardless of anything else you're saying. I'm taking consideration of Dr. Hyer's opinion also. Thank you. Thank you. Counsel? Mr. Young? May it please the Court? Counsel? David Young, I represent the petitioner in this case, Mr. Soriano. Just to highlight some issues, I think Arbitrator Puglia did a very good job of discussing and wrote a very good decision in this case. And just to step back, this is an individual not just, I don't want to be asymptomatic, but a very active person. He was a police officer. He was a security guard for this school. And as part of that, he testified that he worked out. He stayed in shape. And as far as the shoulder complaints, he said that he got shoulder complaints when he lifted weights. But he compared that to other times when he lifted, like doing squats and everything like that, that the complaints of the right shoulder when he did weight lifting was the same as any other muscle group that he worked out. So I can't state, I don't think it's credible that he had these shoulder complaints that were related to this degenerative condition when he was only getting the problems when he was lifting weights. And he related the same as any other muscle group when he worked out. Also, the petitioner coached, was active, and he had been working for the school since 2000. Yeah, 2000 when he took a physical for them and passed it and had no issues. Were there any medical records he went to the doctors complaining about his shoulder prior to the incident at the campus? At the time that he worked for the respondent. No, nothing. He says he didn't have any medical problems. The only issue that the response attorney brought up is 1993. I can't discern from those records, the handwritten records, what shoulder it is, but the typed records in 93 is clear that it's the opposite shoulder at that time. And he doesn't have six years with no problems, no time off, no medical complaints, right? 11 years, I believe, right? From 2000 to 2010, so about 10 years. With no complaints. No complaints, no problems. Until the altercation. Right, exactly. When he fell onto his right, I'll stress right hand landing on his shoulder, injuring his shoulder. As far as Dr. Howder, I don't think either IME states that this condition ever resolved. The petitioner stayed symptomatic from the time he fell onto his hand, right hand, until through both IME examinations had soreness in his shoulder. So to say that the condition completely resolved, I don't think is persuasive in this case. As far as Dr. Robbins' opinions, and I think Dr. Cooley touched on this, is that when Robbins made his opinions, he stated that he felt that the petitioner would have had to have had a reduced range of motion prior to the accident in question, which he did not. He did not believe that the petitioner was asymptomatic, yet there was no evidence that he was not asymptomatic before the fall. Can I ask a question? Yes, John. Do you consider pain to be a compensable condition? Pain by itself, or pain complaints? No, I don't think just pain complaints by themselves. Just pain if it's work-related, you don't think is it compensable? Compensable meaning you're entitled to medical treatment. For that pain, I do, yes. And then if you're entitled to medical treatment, you should be entitled also to TTD if the pain is so severe you can't work. I agree with that, yes, Your Honor. And even though the event does not change the physical condition, merely causes pain, a person can have a bad back that doesn't hurt them. Right. But then they can fall, and for some reason they suffer pain in the back, severe enough so that they can't work. But they haven't changed the degenerative disc disease that they had to begin with. It's the same. So is the pain itself, period, and the effects of the pain, compensable in a workers' compensation action? I would say that pain complaints are compensable in regards to the medical benefits or TTD. I think the extent of your injury for a permanency award, I think you would have to also look at the objective test as well to see if it's worsened. Okay. The objective test? Is there an objective test for pain? Well, no, what I mean is the judge stated that maybe the disc or the degenerative condition hadn't changed at all, and I think you would have to look at that point at the objective test for permanency award, not for compensability. Why? The pain itself is an independent, compensable situation or condition. You're right. Well, I'm just saying for the nature and extent of the permanency basis. But we always love objective, whatever quote objective is over subject. Right, right. It may be nice to show that there's a further misalignment or something or impingement. Right. But would it be an acceptable award if the commission found that even though there hasn't been a change, it still isn't permanent? I believe so, yes. I think something that's important in this case too, and Dr. Newcomber stated it and Dr. Rotman, neither one of them could opine that if the injury didn't happen, when he would need a shoulder replacement. But both of them opined right after this incident he was in need of a shoulder replacement. And I think that shows a clear aggravation of his condition based on his work injuries. But his condition was bone on bone, right? Well, there is no proof that it was, but I think both doctors opined that, correct, prior to the accident in question. This is an end stage arthritis, an end stage type condition. Yeah, you're right. Yes, Judge, I think both of them felt that he was at end stage. But I think both of them stated that when you do surgery on a shoulder, it's based on the pain complaints and function. And prior to the accident in question, he had no pain complaints and he had very good function. And prior to the accident in question, he also didn't have loss of range of motion or any pain complaints. Right after the accident, he loses the range of motion. He has pain complaints. He has the bone on bone. So both doctors agreed he needed the shoulder replacement. Any further questions? I don't believe so. Thank you. Counsel, you may reply. Just quickly, to answer your question regarding the bone on bone, Dr. Duke Kummer did testify that the MRI that was done established that he was 100% bone on bone in that shoulder, which Dr. Newcomer testified, in his opinion, preexisted. But still, there was no record of absence of pain complaints? That's, I guess, where I would go against the five of you in the sense that I feel that the record shows that he did have complaints with certain activity, the activity he testified to. It's a hard situation for when you cross-examine someone who is testifying to ask for us to authorize a surgery. It's a difficult task to see if I can get him to admit that he had pain while he was driving down the street. It's a difficult task as an attorney to ask him if he had problems while he was tying his shoes. I knew in preparation for the trial that he weightlifted. So the record bore out. You know, we don't have an interrogation. Was there any medical opinion that said, I've looked at this, bone on bone, it's inconceivable in my practice that anyone comes in with this objective physical condition that isn't in excruciating pain or has a limited range of motion? Not as strong as you put it, but the doctors do indicate they feel, that's their opinion medically, that he was symptomatic beforehand. I think Dr. Rotman testified he was surprised. Okay. Surprised that the record didn't. I think Dr. Newcomer agreed with that, that the gentleman was seen on the Once again, I go back to the trier of the case. We don't have interrogatories and we're cop cases. And it's a very difficult task to try to elicit testimony from someone who's asking for authorization for surgery, and he's very well represented, a very competent attorney. And it's very difficult to try to find things that he may or may not have problems with with this shoulder. Weightlifting, he said, he was in pain every day. He didn't say he was taking Tylenol every day. I don't think he's going to testify to that. But that's the task I have to overcome on the trier of the case. And I think what the evidence did show he had a problem or some problems with these activities. I just would ask the court to look at the diagnostic studies and the opinions of the orthopedic surgeons to determine where this shoulder was prior to January 22nd, 2010. Thank you. Thank you, counsel. Both the arguments in this matter will be taken under advisement. This position shall issue. Court will stand in recess until 9 o'clock every morning.